# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**CÁMARA DE MERCADEO, INDUSTRIA, Y DISTRIBUCIÓN DE ALIMENTOS**, *et al.*,

      Plaintiffs,

      v.

**BERNARDO VÁZQUEZ**, in his official capacity as director of the Puerto Rico Ports Authority, *et al.*,

      Defendants.

Civil No. 11-1978 (BJM)

## <u>OPINION AND ORDER</u>

Thirty-two organizations and businesses related to Puerto Rico's shipping industry sued the heads of the Puerto Rico Ports Authority ("PRPA") and the Puerto Rico Treasury Department, in their official capacities, seeking injunctive relief from a regulation creating an x-ray scanning procedure and charging a fee at the Port of San Juan. Docket No. 1 ("Compl."). The parties consented to proceed before a magistrate judge. Docket No. 120. A consolidated hearing on the merits of this case was held on June 25 through June 27, 2013. Docket Nos. 169, 170, 172.

The court heard testimony from twelve witnesses, and admitted eleven exhibits. Joint exhibits were also admitted. Docket No. 181. A transcript was prepared. Docket Nos. 173 ("Day 1 Tr."), 174 ("Day 2 Tr."), 175 ("Day 3 Tr."). The parties filed post-trial briefs. *See* Docket Nos. 176 ("Pl. Br."), 177 ("PRPA Br."), and 178 ("Treasury Br."). In light of the findings of fact and legal discussion set forth below, plaintiffs' request for declaratory relief is **DENIED** and injunctive relief is **GRANTED IN PART**.

## BACKGROUND

The findings below are based the credible testimony of the witnesses heard and the documentary evidence received at trial.

***Existing Fees and Services at Port of San Juan***

There are approximately ten ports of entry into Puerto Rico.  The Port of San Juan is by far the largest, handling approximately 80% of all cargo that enters Puerto Rico. The Puerto Rico Ports Authority owns and manages the Port of San Juan, which receives both containerized cargo and bulk (non-containerized) cargo, such as vehicles, fuel or molasses.  Two other sizeable ports—Mayagüez and Ponce—do not belong to PRPA.

For purposes of this litigation, shipping operators handling cargo in the Port of San Juan are subject to the following fees:

- Rent – for the operator's exclusive use of certain yards and warehouses in the Port of San Juan;
- Dockage fee – for the vessel to dock along an assigned pier, calculated by gross tonnage of the vessel;
- Port Service fee (harbor dues) – for the vessel's entrance to the Bay of San Juan, calculated by gross tonnage of the vessel;
- Wharfage (facility surcharge) – for cargo to be unloaded and pass through the Port, calculated based on cargo weight.

According to Hernán Francisco Ayala Rubio ("Ayala"), President of the Puerto Rico Shipping Association ("PRSA"), who participated in the most recent port fees negotiation with PRPA, the port service fee goes towards maintaining the harbor, including the cost of dredging navigational channels and areas in the harbor that the Army Corps of Engineers does not dredge.  The dockage fee, Ayala testified, goes towards maintaining the physical facilities where the vessels dock, such as, the pier, apron, pilings, breakwater, and the general immediate area where ships dock.

Prior to establishing the cargo scanning procedure (and still currently for a number of shipping operators), the Treasury Department would periodically select inbound cargo containers at random and conduct physical inspections of the containers prior to their release from the terminal.

According to Ayala, the majority of shipping operators in the Port of San Juan have their own facility security plans, as required by the U.S. Coast Guard.  The security plans are carried out with funds from the federal government and the respective

companies.  Ayala also stated that PRPA installed cameras in the port areas five or six years ago with federal grant money.

***Advent of PRPA's Cargo Scanning Regulation***

Following the terrorist attacks of September 11, 2001, the International Maritime Organization created the International Ship and Port Facility Security Code.  Congress followed suit in 2002 with the Maritime Transportation Security Act ("MTSA"), 46 U.S.C. §§ 70101 *et seq.*, and the 2006 Security and Accountability for Every Port Act ("SAFE Port Act"), 6 U.S.C. §§ 901 *et seq.*  Compl. 16, ¶ 1.  In 2007, the Governor of Puerto Rico and several agency heads executed a memorandum of understanding regarding, among other issues, port security.  *Id.*, ¶ 2.  The Commonwealth legislature enacted Law No. 12 of February 18, 2008, 23 L.P.R.A. §§ 3221 *et seq.*, also addressing port security.  *Id.*, ¶ 3.

In August 2009, PRPA published a request for proposals for "a complete turn-key solution for 100% inbound cargo scanning at the Port of San Juan."  Exh. VII at 1.  Rapiscan Systems, Inc. ("Rapiscan") subsequently submitted a proposal, which was selected by PRPA in October 2009.  PRPA and Rapiscan entered into a contract on December 17, 2009, whereby Rapiscan would be the exclusive provider of inbound cargo scanning services in the Port of San Juan.  *Id.* at 2.  In August of 2010, Rapiscan transferred its rights and obligations under the contract to S2 Services Puerto Rico, LLC, a fully owned subsidiary of Rapiscan.  Exh. VIII.

In late 2010, PRPA circulated an initial draft of a cargo scanning regulation.  Compl. 16, ¶ 9.  During the first half of 2011, public hearings on the regulation were held; based on those discussions, the regulation underwent several rounds of drafting.  The final regulation, Regulation No. 8067, was promulgated in September 2011.  Exh. IV ("Reg.").  The final regulation specifies that scanning procedures extend to both interstate and foreign cargo, i.e. 100% of inbound cargo in the Port of San Juan.  Reg., art. I, ¶ G.  The regulation does not address cargo scanning at other ports in Puerto Rico.

The regulation contains the following statement of purpose:

> This Regulation aims to regulate and govern the procedures at the new inspection facilities to be established by the Puerto Rico Ports Authority in its maritime port facilities at the Port of San Juan.  The measure seeks to accommodate the interest of the Department of the Treasury to inspect up to 100% of all Inbound Cargo Containers, in order to identify unreported taxable goods, by a non-intrusive scanning (imaging) system that preserves a free and efficient flow of commercial traffic at the ports.  It also seeks to establish the means necessary to improve security and safety at the port facilities, and/or to otherwise advance (or more efficiently advance) the public policy of the Commonwealth of Puerto Rico . . . .

Reg., art. II.  The regulation provides that PRPA personnel may "reduce the percentage of [i]nbound [c]argo [c]ontainers to be scanned, to the percentage that the Authority deems necessary," in the event of an "undue delay and waiting period."  Reg., art. IV, ¶ C.

Earlier that year, in February 2011, PRPA and the Treasury Department executed a memorandum of understanding, whereby the Treasury Department agreed to staff each scanning station with at least one Treasury Department employee, who would be responsible for interpreting the container images provided by S2 Services and for determining whether the container should be detained for further inspection.  Exh. I at 4.  As part of the agreement, PRPA would "reimburse to the Treasury Department all of its costs and expenses related to the Treasury Department's employees . . . that work at the [scanning stations]."  *Id.* at 5.

As of June 2013, the scanning procedure had been implemented at three shipping operator terminals—Crowley, Horizon Lines, and Sea Star Lines.

### The Enhanced Security Fee

As part of Regulation No. 8067 (effective October 11, 2011), all vessels carrying cargo that arrive and unload in the Port of San Juan are required to pay to PRPA an "Enhanced Security Fee" ("ESF").  Reg., art. IV, ¶ J.  The ESF was established to "recover . . . all costs incurred by the Authority in providing, repairing and maintaining an efficient scanning system, . . . as well as providing better security and safety measures and/or related facilities at the Port of San Juan."  *Id.*

The fee is calculated as follows:

| | | |
|---|---|---|
| Cargo in Containers | $ 4.00 | per ton up to $69 per container (Exhibit A) |
| General Cargo | $ 3.25 | per ton |
| Motor Vehicles | $ 4.00 | per ton |
| Liquid Cargo handled in Bulk | $ 0.039 | per 42 gallon barrel |
| Liquid Sugar and Molasses | $ 0.58 | per ton |
| Empty Containers or Chassis | $ 4.00 | per unit |

Reg., art. IV, ¶ K.

ESF rates were determined according to analyses prepared by PRPA's Office of Tariffs Affairs and Economic Studies.  Alfredo Martínez Cintrón ("Martínez"), who heads that office, testified that he conducted the research and analysis that led to the ESF. The rates, he said, were calculated by forecasting the cost of enhancing security at the cargo docks and the amount of cargo that is expected to come in through the port. Specific costs included the S2 Services' contract, depreciation of the scanning areas' construction cost, the payroll and expenses of Treasury employees who work at the scanning stations, the loss of rent income from areas devoted to scanning, and security expenses across various law enforcement agencies.  S2 Services' contract states that it shall receive $57.00 for each container introduced into the Port of San Juan.  Exh. X at 4. Of the security expenses, Martínez testified that approximately $1.4 million from the ESF is allocated to the General Security Office, and $300,000 is allocated to the Office of Maritime Security.  Martínez also admitted that these security expenses were previously covered by another tariff, that the security expenses were transferred to the ESF, and the original tariff has not been reduced.

Starting in October 2011, shipping companies operating in the Port of San Juan began receiving ESF invoices from PRPA.  As of March 31, 2013, $29,551,507.09 had been billed in enhanced security fees; $20,412,371.34 had been collected; of that amount, $17,136,894.00 was paid to Rapiscan or S2 Services.  Exh. XI.  According to Jorge Ortega Fuentes, Internal Revenue Supervisor at the Treasury Department, PRPA pays to

the Treasury Department approximately $1 million annually to cover the payroll and expenses of the Treasury agents who work at the scanning sites.  The three carriers that have scanning stations at their terminals (Crowley, Horizon, and Sea Star) account for approximately 63% of ESF fees billed as of March 31, 2013.[1]  *Id.*

**Impact on Shipping Companies**

At trial, representatives from four shipping companies—Island Stevedoring, Inc.; American President Lines; Luis Ayala Colón Sucres; and Sea Star Lines, LLC—testified as to their experience with Regulation No. 8067.

Mayra Villalón Meunier ("Villalón"), General Manager and Vice President of Island Stevedoring, testified on behalf of the company.  Island Stevedoring handles exclusively bulk cargo (non-containerized) from domestic and foreign locations.  All of its inbound cargo is subject to the ESF; but none of it has been scanned by PRPA.  There are no scanning stations at Island Stevedoring's terminal in the Port of San Juan.  The company (according to Villalón) has paid over $1 million in enhanced security fees.  Exhs. 1, XI.

Villalón testified that due to the ESF's structure, bulk cargo carriers such as Island Stevedoring may end up paying more per ton than container carriers, because container fees are capped at $69 per container.  She also testified that the ESF creates an administrative burden, in that they have to generate another invoice for the ESF to each customer.  However, Island Stevedoring has not hired additional staff to address the added administrative burdens.  The company's clients are also paying the ESF as invoiced.  Island Stevedoring has in place a security plan approved by the U.S. Coast Guard and paid for by the company.

---

[1] ESF fees attributed to Maersk Line and Perez y Compañia are included in this percentage as they are handled through Horizon's terminal.  Day 1 Tr. 93.

José Ángel Vázquez Colón ("Vázquez"), Treasurer of the PRSA and General Manager of American President Lines ("APL")[2] for Puerto Rico and the Dominican Republic, testified on behalf of those two organizations.  APL handles containers exclusively, almost all of which come from foreign locations.  None of APL's containers have been subject to scanning, and there are no scanning stations at APL's terminal. Vázquez, however, has observed delays at scanning stations in other terminals when he visited those sites.  Vázquez testified that APL has paid over $480,000 in ESF fees, but that its customers reimburse APL for the fees and any associated administrative costs.

Hernán Francisco Ayala Rubio, President of PRSA and Vice President of Operations at Luis Ayala Colon Sucres. ("Luis Ayala"), testified on behalf of the company.   Like APL, almost all of Luis Ayala's inbound cargo is of foreign origin, and none of it is scanned by PRPA.  However, because the cargo is international, it is subject to inspection by U.S. Customs and Border Patrol ("CBP").  According to Ayala, as soon as international containers are unloaded from the vessel, they are immediately scanned by the CBP through an X-ray scanning process similar to PRPA's.  The containers are then stored in Luis Ayala's terminal or released to the customer.  Ayala stated that the company has paid approximately $1.5 million to PRPA in enhanced security fees, most of which, including administrative costs, are passed on to its customers.   Ayala also stated that Treasury agents continue to conduct random physical inspections of containerized cargo at Luis Ayala's terminal, as previously conducted prior to the passage of Regulation No. 8067.  Luis Ayala, like other shipping operators, has its own security plan, which is paid for by federal grant dollars and the company's own funds.

Iván Burgos Cruz ("Burgos"), Terminal Manager of Sea Star Lines, testified on behalf of the company.  Sea Star transports both containerized cargo and bulk cargo into the Port of San Juan.  Sea Star has one scanning station at its terminal.  According to

---

[2] APL is not a named party to this case.

Burgos, Sea Star began to pay the ESF in October 2011, and the scanning process started around March 2012.  Burgos testified that most of its clients are paying the ESF, except for one client that refuses to pay the fee.

***Scanning Procedure***

Only three shipping operators' terminals are currently equipped with PRPA scanning facilities—Crowley, Horizon Lines, and Sea Star Lines.  Exh. 2.  All other terminals do not have scanning stations.  Crowley and Sea Star each have one scanning station at their terminals.  Horizon has three scanning stations.  The scanning process currently applies only to containerized cargo.  Bulk cargo is not scanned, even in terminals with scanning stations.

At the three terminals with PRPA scanning facilities, containerized cargo is scanned immediately prior to its departure from the terminal.  Before then, the container may sit for days or weeks in the terminal's warehouse or yard without inspection.  When a particular container is ready to be released from the terminal, the container is placed on a truck and moves to the terminal's dispatch area.  There, a terminal operator confirms that the container is subject to release with appropriate paperwork, and the container moves into the scanning area.  The truck is instructed to move through the scanner at the speed of five to seven miles per hour.  The scanner produces an image, which is reviewed inside a trailer that is staffed by two S2 Services technicians and one Treasury agent.  The Treasury agents staffed at these stations have been trained by S2 services to interpret and analyze the scanner images.  *See, e.g.*, Exhs. A, B, E.

The Treasury agent at this time compares the contents of the container, as shown in the image, with the container's manifest or bill of lading (provided by the shipper), and determines whether the container's contents are accurately reported on the manifest.  If inconsistencies exist between the scanned image and the manifest, the container may be detained for further inspection.  Alby Rosa Martínez ("Rosa"), a Treasury agent who has been working at the scanning stations since the start of the process, stated that the entire

scanning and analysis process lasts around one to two minutes (or less) if everything is normal.  Steven Edwin Flynn, the plaintiffs' expert on ports and container cargo safety, testified to observing the scanning process take around 30-45 seconds per container when he visited the three terminals in August 2012.  Flynn also testified that the scanning technology used at the Port of San Juan is very similar to that used by the U.S. CBP.

Sea Star has five dispatch lanes and one scanning station.  According to Burgos, trucks from the five dispatch lanes have to merge into one, which creates a lot of congestion.  But when there is congestion at the scanning station, PRPA personnel allow every third container to bypass the scanning process.  Rosa testified that since PRPA has instituted the bypass procedure, there have been no further complaints regarding delays. Burgos also testified that at Sea Star, close to 80% of the cargo leaves the terminal on the same day the vessel arrives.  But due to the scanning regulation, Burgos said, Sea Star cannot release containerized cargo after hours, when scanning station personnel have left for the day.  According to Burgos, Sea Star also cannot provide empty containers to its customers after hours.  Rosa testified that the Treasury Department works to accommodate the shipping companies' time tables when setting scanning stations' work hours.  For example, scanning stations may be staffed after normal business hours or on the weekends if a company is scheduled to unload and release cargo at those times.

If the scanner reveals the container holds undisclosed goods that may be subject to taxation, the container is moved to a holding area where it is marked with a Treasury seal for further inspection.  The seal indicates that the container cannot be opened outside the presence of a Treasury agent.  The owner of the container must then schedule an inspection of the container with a Treasury agent, which usually occurs within a few business days.  If contraband is discovered through the scanning process, the appropriate law enforcement authorities (e.g. Puerto Rico Police) are called in to intercept the container.

From November 2011 through December 2012, the Treasury Department has assessed $322,130.84 in taxes owed from unreported merchandise and $31,441 in administrative penalties.  Exhs. 4 at 1; C & D.  Edwin Torres Dones, Internal Revenue agent with Treasury, admitted that some of the administrative penalties may have resulted from the illegal breaking of a Treasury seal and not directly from the scanning process itself.  Since the start of the scanning process in 2011 through 2013, Treasury has scanned a total of 313,383 containers.  Exh. F.  During the three years preceding the scanning procedure (2008 to 2010), when Treasury manually inspected containers, it inspected a total of 7,142 containers.  *Id.*

### PRPA Security

According to Marcos Ariel Olivo Chávez ("Olivo"), Assistant Manager of Security, PRPA's security department is composed of 34 individuals, 22 of whom are officers assigned to posts in the tourism docks, bulk cargo docks, and container docks. Another six officers are permanently assigned to the scanning stations.  Exh. XIII.  PRPA has 168 security cameras throughout the San Juan Bay.  Olivo testified that PRPA has had a security plan in place since 2002, which is revised every five years.

Olivo stated that since the scanning procedures have been in place, Type I and Type II crimes have reduced, including vandalism crimes.  There are fewer reports of missing containers, lost merchandise, and vehicle thefts.  When the scanning procedure has detected importation of weapons, they were imported for legal destinations (e.g. the National Guard).  And eight months ago, two individuals were caught smuggling knapsacks of drugs at the Horizon terminal.

Olivo also testified that PRPA is still working to refine the scanning process. They have plans in the short-term (within the next 40 to 45 days) to implement scanning procedures to cover the shipping operators that currently are not being scanned.  A new scanning site will also be constructed in the Puerto Nuevo dock area as soon as funds for the construction are identified.

## DISCUSSION

Plaintiffs contend that the scanning regulation and enhanced security fee are unconstitutional as violating the dormant Commerce Clause.   Plaintiffs also argue that the enhanced security fee violates the Tonnage Clause of the Constitution.   Pl. Br. 22. Defendants assert that both the scanning regulation and the ESF are constitutional exercises of the Commonwealth's police powers.[3]

### I.       Standing

In their post-trial briefs, defendants argue that plaintiffs do not have Article III standing before this court because they have not suffered injury-in-fact from the regulation.   Treasury Br. 4.   More specifically, defendants point out that any costs incurred by the plaintiffs from the ESF are passed on to their customers, Treasury Br. 4–5, and the scanning procedure has not created a backlog or negatively affected plaintiffs' operations, PRPA Br. 5.

Article III of the Constitution limits the judicial power of the courts to "cases" and "controversies."   U.S. Const. art. III, § 2.   That constitutional limit is embodied in the standing requirements of injury-in-fact, causation, and redressability.   *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 55 (1st Cir. 1998).   An "injury-in-fact" must involve "'an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.'"   *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Plaintiffs during trial proceedings established that Island Stevedoring, Luis Ayala, Sea Star and other shipping operators have paid millions of dollars in enhanced security fees to PRPA (Exh. 1; Day 1 Tr. 24, 52, 81), which constitutes a direct economic injury.

---

[3] Defendants also ask this court to apply the Import-export Clause inspection exception to Puerto Rico in this case.   Treasury Br. 12.   But defendants offer no particularized argument as to whether the Import-export Clause applies to Puerto Rico and how the scanning regulation and ESF could fall under the Clause's inspection exception.   Thus, I decline to consider the passing reference any further.   *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (courts are not obligated to develop skeletal arguments).

Cámara de Mercadeo, Industria, y Distribución de Alimentos v. Vázquez, Civil No. 11-1978 (BJM)          12

*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 267 (1984) (finding economic injury where plaintiffs are directly responsible for paying the challenged tax).  Defendant's argument to the contrary is not persuasive.  The Supreme Court, in *Bacchus Imports*, rejected the State of Hawaii's argument that the plaintiffs lack standing because they can and do pass on the disputed tax to their customers.  *Id.*  "Even if the tax is completely and successfully passed on," the Court noted, "it increases the price of their products as compared to the [tax-exempt] beverages, and the wholesalers are surely entitled to litigate whether the discriminatory tax has had an adverse competitive impact on their business." *Id.*  Likewise here, the ESF increases the prices plaintiffs charge their customers, arguably to their detriment.  Thus, some of the plaintiffs have suffered an injury-in-fact that is directly caused by Regulation No. 8067, and which can be remedied by this court. Because at least some plaintiffs have standing to seek the requested relief, the court need not determine the standing of other plaintiffs' seeking the same relief.  *Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 11 (1st Cir. 2005), *abrogated on other grounds*, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007).  In short, I find that Article III standing requirements are satisfied.

## II.     Scanning Procedure

Plaintiffs first argue that the scanning procedure violates the dormant Commerce Clause as an impermissible burden on interstate commerce.  Pl. Br. 21.  Defendants counter that the scanning procedure is a valid exercise of Puerto Rico's police powers and does not unduly burden interstate commerce.  Treasury Br. 12; PRPA Br. 7.

The Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States."  U.S. Const. Art. I, § 8, cl. 3.  By negative implication, the Constitution deprives individual states of the power to "impede the flow of goods" between them.  *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 32–33 (1st Cir. 2007).  State action that "discriminates against interstate commerce on its face" in either purpose or effect is invalid unless the state interest it promotes "cannot be achieved

through any reasonable nondiscriminatory alternative." *Id.* at 33.   Regulation is discriminatory if it both benefits identifiable in-state economic interests and burdens out-of-state interests.   *Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 21 (1st Cir. 2000) (citing *Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 99 (1994)).   Non-discriminatory regulation that nonetheless burdens interstate commerce is only invalid if that burden is "clearly excessive" when balanced against the intended local benefits.   *Cherry Hill Vineyard*, 505 F.3d at 33 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Wine and Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 11 (1st Cir. 2007)).   A plaintiff bears the burden of proving such excessiveness.   *Wine and Spirits Retailers*, 481 F.3d at 15.   Moreover, under *Pike*, "the fact that a law may have devastating economic consequences on a particular interstate firm is not sufficient to rise to a Commerce Clause burden."   *Pharm. Research & Mfrs. Of Am. v. Concannon*, 249 F.3d 66, 84 (1st Cir. 2001) (internal quotations omitted).

Plaintiffs do not argue that the scanning regulation is facially discriminatory; rather, they claim the regulation is unconstitutional under *Pike* as it imposes a substantial burden on interstate commerce with no concomitant benefit to the Commonwealth. Plaintiffs, however, have failed to prove that Regulation No. 8067 burdens interstate commerce in a meaningful way.

The scanning procedure, plaintiffs contend, burdens interstate commerce because it affects "the flow of cargo."   Compl., ¶ 35.   Specifically, the plaintiffs claim that the scanning procedure creates congestion and delays, and generally impedes the flow of cargo leaving the terminals.   The plaintiffs, however, failed to adduce at trial convincing testimony that the scanning procedure is in fact causing significant delays at the Port of San Juan.   To the contrary, Iván Burgos, Sea Star's Terminal Manager, and the only witness operating a site currently subject to scanning, testified that Port Authority personnel allow every third container to bypass the scanning procedure altogether when

congestion builds at the scanning station.  Day 3 Tr. 18; *see also* Day 2 Tr. 51 (Flynn testified to observing trucks moving through every 30-45 seconds).  And in their post-trial brief, the plaintiffs summarily assert the scanning procedure imposes "operational burdens on shipping companies" without reference to any exhibits or witness testimony. Pl. Br. 22.  The only witness that testified to observing delays is José Ángel Vázquez Colón, Treasurer of the Puerto Rico Shipping Association and President of American President Lines ("APL").  Vázquez testified that he observed delays at the scanning stations when he visited those sites.  Day 1 Tr. 61.  However, Vázquez's employer, APL, does not have scanning stations (Day 1 Tr. 63), and thus he does not first-hand knowledge as to whether the scanning procedure consistently produces significant delays.  I find no credible evidence tending to show that the scanning procedure impacts the flow of cargo in a significant way.

During trial, plaintiffs also alluded to other burdens resulting from the regulation, namely (1) administrative burdens for billing the enhanced security fee to customers, and (2) Sea Star's inability to release containerized cargo or empty containers to its customers after hours.  As to the administrative burdens associated with the ESF, plaintiffs' witnesses admitted that most of the fee and related administrative costs are passed on to their customers.  Plaintiffs have not had to hire additional staff to deal with the supposed increased clerical work.  And with regard to Sea Star's inability to release containerized cargo or empty containers after hours, plaintiffs have failed to explain how that inconvenience constitutes a burden on interstate commerce.  Sea Star cannot point to an instance in which it lost a customer because of the scanning regulation.  Day 3 Tr. 29–30. Moreover, even if Sea Star had lost a customer due to the scanning regulation, its loss of profits alone does not establish a Commerce Clause burden.  *Concannon*, 249 F.3d at 84 (noting a regulation's possible impact on a particular company's profits is insufficient to constitute a burden on interstate commerce).

Contrary to plaintiffs' assertions, Regulation No. 8067 has produced intended local benefits.  The regulation has two intended purposes: (1) to "identify unreported taxable goods" for tax collection purposes, and (2) "to improve security and safety at the port facilities."  Reg., art. II.  Improving tax collection efforts and port security are legitimate state goals.  The scanning procedure has enabled the Treasury Department to identify undeclared taxable merchandise, and assess $322,130.84 in taxes owed and $31,441 in administrative penalties.  Exhs. 4 at 1; C & D.  It is also undisputed that the scanning technology enables PRPA to detect the importation of dangerous contraband into Puerto Rico.  The fact that more can be done to enhance the safety and security of port facilities does not negate the public benefits achieved through Regulation No. 8067.

Absent a showing that the challenged regulation burdens interstate commerce, plaintiffs have failed to meet their burden of showing that the regulation's burden on interstate commerce is "excessive."  *Wine and Spirits Retailers*, 481 F.3d at 15.  Even assuming that the scanning procedure imposes some delays and administrative burdens on the plaintiffs, that burden is not clearly excessive when balanced against the regulation's intended and actual benefits.  *Concannon*, 249 F.3d at 84.

Therefore, I find that the scanning procedures under Regulation No. 8067 do not violate the dormant Commerce Clause.

## III.   Enhanced Security Fee

Plaintiffs next argue that the enhanced security fee is unconstitutional under the Commerce Clause.

A port fee violates the Commerce Clause unless it is (1) "based on some fair approximation of use or privilege for use," (2) does not discriminate against interstate commerce, and (3) is not "excessive in comparison with the governmental benefit conferred."  *See Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 716–17 (1972).  While the *Evansville* test arose in the context of airport fees, it

Cámara de Mercadeo, Industria, y Distribución de Alimentos v. Vázquez, Civil No. 11-1978 (BJM)                16

has been extended to other fees on interstate transportation.  *See, e.g.*, *Doran v. Mass. Tpk. Auth.*, 348 F.3d 315, 320–21 (1st Cir. 2003) (applied to toll road discounts).[4]

A Connecticut case dealing with port passenger fees illustrates the application of the *Evansville* test.  The Bridgeport Port Authority ("BPA") managed the municipality's port district, which included a dock from which a ferry service ran, a shipping terminal, and a shipyard.  *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 82 (2d Cir. 2009), *cert. denied*, 130 S.Ct. 1075 (2010).  A passenger fee was assessed on all persons and vehicles embarking on or disembarking from the ferry service, and the resulting revenues funded "essentially all" of the BPA's operating expenses.  *Id.* at 82–83.  The district court applied the *Evansville* test and found that several BPA expenditures were of no benefit to ferry passengers, and that the fee therefore violated the Commerce Clause.  *Id.* at 85.  The Second Circuit affirmed, explaining that "[t]he limits of both a fair approximation of use and excessiveness are plainly exceeded when the fees support a BPA budget that includes . . . a development project for reducing traffic on I–95, the interstate highway running generally along the Connecticut shore."  *Id.* at 87.  The court noted that ferry passengers who drive along I-95 are undoubtedly "grateful for any reduction in traffic," but such general "quality-of-life improvements cannot be said to confer an actual or potential benefit to the ferry passengers *as users of the ferries* and thus exceed the bounds of what may reasonably serve as the basis for the BPA's fee."  *Id.* at 87 (emphasis added).

---

[4] General state taxes affecting interstate commerce are subject to the similar but different four-pronged *Complete Auto Transit* test.  *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977) (a general state tax passts muster under the Commerce Clause where the tax applies to an activity with a substantial nexus to the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to services provided by the State); *see also Commonwealth Edison Co v. Montana*, 453 U.S. 609, 618 (1981).  Here, the ESF was designed as a specific-fund revenue measure not part of Puerto Rico's general revenue scheme.  Day 3 Tr. 81.  Hence, *Evansville*'s analysis of user fees and taxes designated for a specific state-provided facility is the appropriate framework for evaluating the constitutionality of the ESF.  *See Commonwealth Edison*, 453 U.S. at 621–22 & n.12.

Here, plaintiffs argue that the ESF fails on all three prongs of *Evansville*: (1) that the ESF does not fairly approximate use or privilege of use because the fee goes towards activities that present no benefit to plaintiffs; (2) that the fee is excessive in comparison to the governmental benefits conferred; and (3) that the fee discriminates against interstate commerce.  PRPA in response argues that the fee fairly approximates the plaintiffs' use of the port facilities, and that all revenues from the ESF are directed towards activities intended to improve port security and benefit the plaintiffs.

To begin with, I note that the ESF does not discriminate against interstate commerce.  While most or all cargo arriving at the Port of San Juan originates from outside of Puerto Rico, Regulation No. 8067 and the ESF apply with equal force to vessels originating from other ports within Puerto Rico.  Under a plain reading of the regulation, a ship carrying cargo from Ponce to San Juan would also be subject to the ESF.  Reg., art. IV.  Thus, it cannot be said that the ESF on its face discriminates against interstate or foreign commerce to the benefit of intrastate businesses.  *See Evansville*, 405 U.S. at 717.

The enhanced security fee, however, is problematic under the fair approximation and excessiveness limits set out in *Evansville*.  As in *Bridgeport*, the fair approximation and excessiveness prongs substantially overlap, because plaintiffs here argue that the fee goes towards activities that they neither use nor benefit from.  To evaluate that claim, it is necessary to first examine which activities the fee supports.  Of the $20.4 million that has been collected from ESF, around $17.2 million, or 84%, has been paid to the scanning service provider.  Exh. XI.  And around $1 million annually from the ESF goes towards paying the salaries of Treasury agents who work at the scanning stations.  Day 3 Tr. 78.  On the whole, it appears that the vast majority of ESF revenues are spent on expenses relating to the scanning procedure, and a much smaller amount is directed towards general port security (around $1.7 million annually).  With respect to the fees, plaintiffs' claim rests on the assumption that the scanning process provides them with no specific

benefits, and it is true that the scanning process benefits all Puerto Rico residents by enabling the government to more effectively identify unreported merchandise or detect hidden contraband.  But companies subject to scanning do individually benefit—from a reputational standpoint—through increased consumer confidence in the shipping company's reliability and trustworthiness as a safe and law-abiding shipping operator. *Cf. Center for Auto Safety, Inc. v. Athey*, 37 F.3d 139, 143–44 (4th Cir. 1994) (finding Maryland's regulatory fee on charitable organizations a constitutional user fee because the charities benefit through enhanced "donor confidence . . . owing to the state's regulation of charities").  At the same time however, this reputational benefit, enjoyed by the three shipping operators currently subject to scanning, does *not* attach to those that are not in fact subject to scanning.  With this understanding, I turn to the remaining two prongs under *Evansville*.

In determining whether the fee is a fair approximation of use, "the Constitution requires not 'precision' but" rather calls for "'rough approximation' in matching fee and benefit."  *N.H. Motor Transp. Ass'n v. Flynn*, 751 F.2d 43, 47 (1st Cir. 1984) (quoting *Evansville,* 405 U.S. at 715–16).  Here, the fee does not roughly approximate use or privilege of use, where a significant portion of shipping operators subject to the fee have not used, nor have they had the privilege of using, the scanning stations funded by the ESF.  First, shipping operators pay enhanced security fees for all bulk cargo they bring in to the port, but none of the bulk cargo is actually scanned.  Day 1 Tr. 24; Day 3 Tr. 19. Additionally, some shipping operators do not have scanning stations in their terminals— any containers they bring in, and upon which the ESF is assessed, are not scanned.  *See, e.g.*, Day 1 Tr. 52–53, 73.  And while the three shipping companies with the largest volume—Crowley, Horizon, and Sea Star—are equipped with scanning stations, the evidence indicates that around 37 to 38% of ESF funds are paid for by shipping operators that do not have the privilege of using the very scanning facilities that the ESF supports. Exhs. 2, XI.

The ESF also cannot be characterized as a harbor or port fee providing for general fire and safety services that benefit all shipping operators equally. *Clyde Mallory Lines v. Alabama*, 296 U.S. 261, 267 (1935) (sustaining the constitutionality of a port fee imposed for police and fire services). Defendants assert that $1.7 million from the ESF is directly allocated to general security. But the bulk of ESF revenues are intended for and have been used to facilitate the scanning of all inbound cargo. Reg., art. IV, ¶ J ("The Enhanced Security Fees . . . are established to recover . . . all costs incurred by the Authority in providing, repairing and maintaining an efficient scanning system"). Moreover, Alfredo Martínez Cintrón, PRPA's Chief of Tariffs, admitted that the $1.7 million in security expenses were already accounted for in a pre-existing port fee, which has not been reduced since the ESF's implementation. Day 3 Tr. 101–02. Because a significant portion of ESF funds is dedicated to scanning facilities that are not actually enjoyed by a significant portion of ESF payors, the fee does not represent a fair approximation matching benefits to burdens.

For similar reasons described above, the ESF also imposes on some shipping operators a burden that is excessive relative to the benefits conferred. The plaintiff bears the burden of proving that a fee is unconstitutionally excessive. *See Flynn*, 751 F.2d at 47. The excessiveness inquiry focuses on the benefits conferred on the fee's payors, i.e. the shipping operators, and the costs incurred in providing those benefits. *See Cohen v. R.I. Tpk. & Bridge Auth.*, 775 F. Supp. 2d 439, 449 (D.R.I. 2011). The question here is not how the dollars are actually spent, but "the relationship between the *amount* the fees raise and the *amount* the state likely spends." *Flynn*, 751 F.2d at 49. Here, the state likely spends very little ESF-generated funds on shipping companies that lack scanning stations at their terminals. These companies receive little, if any, benefits from the ESF; they certainly cannot partake in the benefits flowing from the scanning process. In comparison, they are heavily burdened—to the tune of millions of dollars in enhanced security fees annually. And while Marcos Olivo, Assistant Manager of Security at PRPA,

testified that minor crimes, vandalisms, and cargo thefts have gone down since the regulation's implementation, the defendants failed to explain how the collection and use of ESF funds has actually contributed to that decline in crime.  In short, there is no credible evidence that the decrease in crime at the Port of San Juan is a benefit resulting from the ESF; and the defendants have failed to rebut plaintiffs' showing that the shipping operators who are not scanned receive little to no benefit from the fee.

Indeed, the most tangible benefits flowing from the ESF are the improvements in tax collection efforts and the detection of dangerous contraband flowing into Puerto Rico. These improvements undoubtedly benefit the public, including the plaintiffs, but it cannot be said that those shipping companies without scanning stations receive an "actual or potential benefit" *as users* of the Port of San Juan.   *Bridgeport*, 567 F.3d at 87. Therefore, I find that plaintiffs have met their burden of showing the ESF's excessiveness with respect to those shipping companies that lack scanning stations.

Having found that the fee is unconstitutional with respect to some plaintiffs does not end the inquiry.  Plainly, the three shipping operators equipped with scanning stations, and who benefit in some degree from the ESF, stand in contrast to those that do not have the privilege of using the scanning stations, and thus benefit very little from the fee. Thus, it is necessary to separately examine whether the fee is constitutional as applied to the shippers that have scanning stations at their terminals.  I find that it is.  First, the ESF is not a flat fee, but a sliding scale based on the amount of cargo unloaded at the Port, and which fairly approximates each shipper's use of their scanning stations.  It suffices that each container they unload is potentially subject to scanning, and it does not matter that during busy workdays, some containers may bypass the scanning procedure.  *Flynn*, 751 F.2d at 47.

Second, the fee is not excessive relative to the benefits conferred.  As discussed above, the scanning process does specifically benefit shippers with scanning stations because it creates a regulatory scheme that enhances the shipping operators' reputation

for safety and reliability.  The customers of shipping operators that have scanning stations and are subject to 100% scanning can be more confident that the shipper operates in accordance with the law, because undeclared merchandise or dangerous contraband will be detected via the scanning process.  Given these benefits, plaintiffs have failed to show that the ESF is excessive.  Indeed, a significant portion ($17 million) of the fees collected ($20 million) thus far have gone to paying S2 services, the scanning service provider.  Under these circumstances, the ESF is more akin to the New Hampshire hazardous waste truck license fee that the First Circuit upheld in *Flynn*, because here the amount collected is "roughly equivalent to the services the state provides" the shipping operators or the "costs that they impose upon the state."  751 F.2d at 49.

In sum, the enhanced security fee is unconstitutional as applied to shipping operators without scanning facilities because it (1) does not fairly approximate their use or privilege of using port scanning facilities, and (2) is excessive relative to the benefits conferred.  The fee, however, is constitutional as applied to shipping operators that have and use PRPA scanning facilities.

## IV.   Tonnage Clause

For the first time at trial, plaintiffs asserted that the ESF violates the Tonnage Clause of the Constitution, which forbids states "without the consent of Congress, [to] lay any duty of tonnage."  U.S. Const. art. I § 10, cl. 3.  The Tonnage Clause was intended to work in conjunction with the Import-export Clause (art. I §10, cl. 2) to restrain the states from exercising "the taxing power injuriously to the interests of each other."  *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 7, (2009) (internal quotations omitted).  The Clause has been interpreted to prohibit all state and local duties, in whatever form, that impose "a charge for the privilege of entering, trading in, or lying in a port."  *Polar Tankers*, 557 U.S. at 9.  States may not impose taxes on vessels "to raise general revenues [or] to regulate trade."  *New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, 874 F.2d 1018, 1023 (5th Cir.1989) (citing *Clyde Mallory Lines*, 296 U.S. at 265–

66). "The [C]lause does not, however, prohibit charges made by a state authority for services rendered such as pilotage, wharfage, charges for the use of locks, or fees for medical inspections." *Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536, 545 (D.C. Cir. 1988). But fees imposed must be "apportioned as closely as is practicable" to the benefits received, *id.* at 545 n. 8, and the service must be available to all fee payers, *Clyde Mallory*, 296 U.S. at 266.

Plaintiffs' Tonnage Clause argument raises a question of first impression, as the Tonnage Clause has never been held to apply to Puerto Rico. However, the court need not reach this question today. This claim was not raised in the pleadings, and plaintiffs have not moved to amend the pleadings to conform to the evidence. Fed. R. Civ. P. 15(b). Moreover, the issue was not tried by express or implied consent of the parties. *Keeler v. Hewitt*, 697 F.2d 8, 13 (1st Cir. 1982) (finding defendants neither expressly nor impliedly consented to try a malicious prosecution claim that was first raised at trial, where defendants objected to plaintiffs' request for jury instructions on malicious prosecution). Plaintiffs failed to mention the Tonnage Clause during the past two years of this proceeding, and only first raised it during the hearing. The defendants, in their post-trial briefs, objected to plaintiffs' last-minute attempt to insert the Tonnage Clause argument. PRPA Br. 18. I find that the defendants did not consent to trying the Tonnage Clause argument.

I further find that permitting conformance of the pleadings would be prejudicial to the defendants. Had defendants been timely alerted to the claim, they would have been able to seek discovery relevant to the Tonnage Clause argument, "engage in appropriate legal research, and perhaps offer evidence and authority tending to rebut the claim." *Keeler*, 697 F.2d at 14. In sum, "no satisfactory reason appears for not having identified

this issue before trial" and thus the court refuses to entertain this new theory of liability.[5]
*Id.*

## V.     **Declaratory Judgment**

The plaintiffs seek a declaratory judgment that Regulation No. 8067 is unconstitutional in violation of the Commerce Clause.

The Declaratory Judgment Act provides in relevant part:

> In a case or controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).  However, when "matters of great public moment are involved," courts should exercise caution in granting declaratory relief, and declaratory judgments in such circumstances "should not be pronounced unless the need is clear, not remote or speculative." *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 494 (1st Cir. 1992) (internal quotations omitted); *see also Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995).

With these principles in mind, I find that a declaratory judgment would be neither appropriate nor helpful in this case.  The very nature of this public law controversy counsels against granting a declaratory judgment.  Furthermore, the legal relationship between the parties does not require clarification, and the court's findings on the substantive claims and the permanent injunction will provide the necessary relief to the

---

[5] Disposition of the Tonnage Clause claim is also unnecessary because of the above ruling that the ESF is unconstitutional under the dormant Commerce Clause and *Evansville*.  *See supra* Pt. III.

plaintiffs.  *See Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 566 F. Supp. 2d 81, 106 (D. Conn. 2008) (similarly declining to grant declaratory relief).

## VI.    Permanent Injunction

To obtain injunctive relief, a plaintiff must satisfy the well-established four-part test and demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest will not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006).  The plaintiffs have established that the enhanced security fee, as applied to shipping operators that neither use nor have the privilege of using PRPA scanning facilities, violates the Commerce Clause.  Remedies at law, including monetary damages, are inadequate to remedy these plaintiffs' injuries because the government currently continues to assess and collect ESFs in excess of constitutional limits.  Plaintiffs' monetary injuries are also difficult to accurately measure.  Considering the balance of hardships, injunctive relief is warranted because plaintiffs continue to be subject to the unconstitutional fee; and the public interest will not be disserved by an injunction limited to curbing the constitutional violation established in this proceeding.

The court hereby enjoins the defendants from collecting enhanced security fees from shipping operators that are not being scanned pursuant to Regulation No. 8067.

## CONCLUSION

For the foregoing reasons, plaintiffs' request for declaratory relief is **DENIED** and injunctive relief is **GRANTED IN PART**.  This opinion sets out the court's separate findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1).  Final judgment shall be entered.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 16th day of October, 2013.

*S/ Bruce J. McGiverin*

BRUCE J. McGIVERIN
United States Magistrate Judge